IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

FRANKLIN BASKERVILLE,   )
   Plaintiff,      )
            )
    v.       )   Civil No.  3:14cv423 (REP)
            )
CAROLYN W. COLVIN,    )
Acting Commissioner of Social Security, )
   Defendant.     )
_____)

## REPORT AND RECOMMENDATION

Franklin Baskerville ("Plaintiff") is sixty years old and previously worked as a machine operator in the manufacturing and textile industries, as a manager at a cotton mill, performing maintenance at a hotel and as a framer for manufactured homes. On August 12, 2011, Plaintiff applied for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act ("Act"), alleging disability from depression, anxiety, hypertension, sleep apnea, migraine headaches and hyperthyroidism, with an alleged onset date of October 31, 2010. Plaintiff's claims were denied both initially and upon reconsideration. On June 19, 2013, Plaintiff (represented by counsel) appeared at a hearing before an Administrative Law Judge ("ALJ"). The ALJ subsequently denied Plaintiff's claims in a written decision on June 28, 2013. On April 15, 2014, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner.

Plaintiff now appeals the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g), arguing that the ALJ erred in in evaluating and assigning weight to certain medical opinions, in determining Plaintiff's residual functional capacity ("RFC"), and in failing to procure a

consultative examination. The parties have submitted cross-motions for summary judgment that are now ripe for review.

Having reviewed the entire record in this case, the Court is now prepared to issue a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).[1] For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 12) and Motion for Remand (ECF No. 13) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 15) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## I.     BACKGROUND

Because Plaintiff challenges the ALJ's decision, Plaintiff's education and work history, relevant medical records, function report, hearing testimony, state agency physicians' opinions and vocational expert ("VE") testimony are summarized below.

A. Education and Work History

Plaintiff completed school through the twelfth grade. (R. at 210). Plaintiff previously worked as a machine operator in the textile industry and furniture manufacturing, as a manager at a cotton mill, performing maintenance at a hotel and as a framer for manufactured homes. (R. at 210.)

B. Medical Records

On August 12, 2009, Plaintiff visited Rachel I. Huot, M.D. at Boydton Medical Center. (R. at 320-21.) Plaintiff stated that he wanted to stop smoking and that he believed that his alcohol abuse contributed to his depression. (R. at 320.) Plaintiff indicated that he continued to

---

[1]     The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

drink. (R. at 320.) Plaintiff reported that he had been prescribed medications to manage his depression but stopped taking them. (R. at 320.) Dr. Huot observed that Plaintiff appeared pleasant, alert and fully oriented. (R. at 320.) Dr. Huot assessed that Plaintiff suffered hypertension, erectile dysfunction and depression. (R. at 320-21.) Dr. Huot prescribed Lisinopril, Viagra and Wellbutrin, and recommended that Plaintiff follow-up in three months. (R. at 321.) On November 12, 2009, Plaintiff stated to Dr. Huot that he did not take his prescriptions, continued to drink and decreased the amount that he smoked per day. (R. at 318.) Dr. Huot noted that Plaintiff appeared pleasant, alert and fully oriented. (R. at 318.) Dr. Huot prescribed Lisinopril and recommended that Plaintiff take Vitamin B-12 and Folate. (R. at 319.) On April 28, 2010, Dr. Huot again noted that Plaintiff appeared pleasant, alert and fully oriented. (R. at 316.) Dr. Huot diagnosed Plaintiff with insomnia, depression and hypertension, and prescribed Citalopram and Trazodone. (R. at 317.)

On May 28, 2010, Plaintiff met with Dr. Huot. (R. at 312.) Plaintiff stated that his depression had not improved and that he experienced trouble sleeping. (R. at 312.) Dr. Huot noted that Plaintiff appeared pleasant, alert and fully oriented. (R. at 312-13.) Dr. Huot prescribed Citalopram and Trazodone, and directed Plaintiff to participate in a sleep study. (R. at 313.)

On October 28, 2010, Plaintiff again met with Dr. Huot. (R. at 310.) Plaintiff stated that he continued to drink alcohol and still experienced depression. (R. at 310.) Dr. Huot observed that Plaintiff remained pleasant, alert and fully oriented. (R. at 311.) Dr. Huot refilled Plaintiff's prescriptions and recommended that Plaintiff return for follow-up in three months. (R. at 310-11.)

3

On January 2, 2011, Plaintiff was hospitalized at the Community Memorial Pavilion for major depression with suicidal ideations after he stabbed himself in the stomach. (R. at 285.) Plaintiff admitted that he had been drinking alcohol and stated that he never attempted to hurt himself before, but blamed his alcohol abuse. (R. at 285.) Veeraindar Goli, M.D., a hospital psychiatrist, examined Plaintiff and opined that Plaintiff suffered from major depression. (R. at 285.) On January 3, 2011, Dr. Goli noted that Plaintiff appeared alert, oriented and cooperative, but dysthymic. (R. at 286.) Plaintiff denied any psychosis or intent to hurt himself, but admitted to depression. (R. at 286.) Dr. Goli suggested that Plaintiff appeared in denial of his alcoholism, but remained otherwise cognitively intact and assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 30.[2] (R. at 286.)

On January 5, 2011, Masoud Hejazi, M.D., discharged Plaintiff after he completed detox and wanted to be discharged. (R. at 288.) Dr. Hejazi determined that Plaintiff exhibited no manic, hypomanic, psychotic or suicidal symptoms. (R. at 288.) Dr. Hejazi assessed that Plaintiff had a GAF score of 40. (R. at 288.) Dr. Hejazi prescribed Paxil, Trazodone and Folic Acid. (R. at 288.) Dr. Hejazi opined that Plaintiff had partially improved and showed equivocal

---

[2]     The GAF is a numeric scale (0 through 100) used by mental health clinicians and physicians to rate the social, occupational and psychological functioning of adults. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 2000). Scores ranging from 31 to 40 indicate some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. *Id.* Scores ranging from 41 to 50 indicate serious symptoms or serious impairment in social, occupational or school functioning. *Id.* Scores ranging from 51 to 60 indicate moderate symptoms or moderate difficulty in social, occupational or school functioning. *Id.* Scores ranging from 61 to 70 indicate some mild symptoms or some difficulty in social, occupational or school function, but generally functioning well, with some meaningful interpersonal relationship. *Id.* Notably, the latest version of the Diagnostic and Statistical Manual of Mental Disorders ("DSM") has dropped the use of GAF scores, finding that their use has been criticized due to a "conceptual lack of clarity," and "questionable psychometrics in routine practice." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 16 (5th ed. 2013).

prognosis. (R. at 288.) Dr. Hejazi recommended Alcoholics Anonymous ("AA") to Plaintiff. (R. at 288.)

On January 28, 2011, Plaintiff met again with Dr. Huot. (R. at 308-09.) Plaintiff stated that he felt depressed, noting that he had a lot going on and "was doing a lot of drinking." (R. at 308.) Dr. Huot completed a mental examination and observed that Plaintiff appeared pleasant, well-oriented and fully alert. (R. at 309.) On May 6, 2011, Plaintiff stated that he participated in counseling sessions. (R. at 306.) Dr. Huot opined that Plaintiff remained well-oriented and fully alert. (R. at 306.)

On June 6, 2011, Syng P. Seo, M.D., at Southside Community Services Board, evaluated Plaintiff. (R. at 349-51.) Plaintiff presented with no complaints. (R. at 349.) Plaintiff stated that before his hospitalization, he experienced bad thoughts and heard voices while under the influence of alcohol. (R. at 349.) Plaintiff described feeling "all right"and reported taking his medication regularly, while claiming that he remained sober after his January 2011 hospitalization. (R. at 349.) Dr. Seo completed a mental examination and observed that Plaintiff dressed properly and demonstrated good personal hygiene and care. (R. at 350.) Plaintiff appeared calm and relaxed, exhibited good eye-contact and maintained pleasant interactions. (R. at 350.) Dr. Seo noted that Plaintiff demonstrated bright affect, normal speech and clear thought. (R. at 350.) Plaintiff had no suicidal or homicidal ideation. (R. at 350.) Further, Plaintiff remained alert, well-oriented and had good attention and memory. (R. at 350.) Dr. Seo diagnosed Plaintiff with dysthymic disorder and alcohol abuse. (R. at 351.) Dr. Seo assigned Plaintiff a GAF score of 65. (R. at 351.)

On August 5, 2011, Plaintiff met with Dr. Huot, complaining of headaches. (R. at 302.) Plaintiff stated that Tylenol usually helped. (R. at 302.) Dr. Huot observed that Plaintiff

appeared pleasant, well-oriented and fully alert, and recommended that Plaintiff follow-up in three months. (R. at 303.)

On August 15, 2011, Plaintiff returned to Dr. Seo for a medication management follow-up. (R. at 351.) Plaintiff reported feeling increased sadness around the anniversary of his wife's death. (R. at 175, 351.) However, Plaintiff stated that he slept well, lived with his mother and continued to search for employment. (R. at 351.) Plaintiff also claimed that he remained sober after his January 2011 hospitalization. (R. at 351.) Dr. Seo observed that Plaintiff appeared calm, cooperative and denied any suicidal ideation. (R. at 356.) On December 15, 2011, Plaintiff again stated to Dr. Seo that he missed his wife and felt sad. (R. at 356.) Plaintiff reported that he worked on staying sober and finding a job. (R. at 356.) Dr. Seo observed that Plaintiff appeared calm and cooperative. (R. at 356.) Plaintiff also denied suicidal ideation and continued therapy. (R. at 356.)

On September 7, 2012, Plaintiff visited Sharon A. Reilly, M.D. at Charlotte Primary Care to test his blood pressure. (R. at 365.) Plaintiff reported that he started Lisinopril again. (R. at 365.) Plaintiff explained that he alternated between two medications, Nortriptyline and Amitriptyline. (R. at 365.) Plaintiff noted that his headaches had largely disappeared and that he felt much better overall after he started his medications. (R. at 365.) Dr. Reilly noted that depression remained a problem, instructed Plaintiff to continue his medications and to schedule a follow-up appointment for six months. (R. at 365.)

On March 13, 2013, Plaintiff returned to Dr. Reilly and admitted that he continued to drink on a regular basis and consumed "whatever was available." (R. at 363.) Plaintiff stated that he continued to smoke one pack of cigarettes per day, remained unemployed and lost his driver's license following his DUI. (R. at 363.) Dr. Reilly reduced his dosage of Paroxetine

(Plaintiff's depression medication), prescribed Wellbutrin and instructed Plaintiff to follow-up in six months. (R. at 363.)

C.  State Agency Psychologists' Opinions

On October 12, 2011, Stephen P. Saxby, Ph.D., a state agency psychologist, reviewed Plaintiff's medical records and assessed Plaintiff's mental RFC. (R. at 64-68.) Dr. Saxby considered whether Plaintiff satisfied the requirements under listings 12.04-Affective Disorders and 12.09-Substance Addiction Disorders. Dr. Saxby determined that although Plaintiff had a medically determinable impairment, he did not meet or medically equal listings 12.04 or 12.09. (R. at 65.) Dr. Saxby assessed Plaintiff's mental RFC and opined that Plaintiff retained the RFC to perform simple, unskilled work. (R. at 67-68.)

On January 25, 2012, Eric Oritt, Ph.D., a state agency psychologist, also assessed Plaintiff's mental impairments and RFC. (R. at 87-91.) Dr. Oritt also concluded that Plaintiff did not meet or medically equal listings 12.04 and 12.09, and that Plaintiff retained the RFC to perform simple, unskilled work. (R. at 88, 90.)

D.  Function Report

On September 19, 2011, Plaintiff completed a function report. (R. at 231-38.) Plaintiff indicated that he lived in an apartment with family and spent his days watching television, bathing, reading, taking medications and eating. (R. at 231.) Plaintiff indicated that his condition affected his sleep. (R. at 232.) Plaintiff had no problem tending to his personal care, but noted that he used the bathtub instead of the shower and that he needed longer to get dressed. (R. at 232.) He needed no special reminders to take care of his personal needs or grooming, but required reminders to take or refill his medications. (R. at 233.)

Plaintiff prepared his own meals and could make sandwiches and frozen dinners daily or prepare a full meal once in a while. (R. at 233.) He cleaned, laundered and ironed his clothes, but noted that he sometimes needed encouragement to clean. (R. at 233.) Plaintiff went outside several times each day. (R. at 234.) When he went out, he rode in a car. (R. at 234.) Although Plaintiff did not have a car, he could go out alone. (R. at 234.) He could buy groceries and toiletries at the store and shopped approximately one to two times per week for two hours. (R. at 234.) Plaintiff could pay bills, count change, handle a savings account and use a checkbook or money order. (R. at 234.) Plaintiff indicated that his ability to handle money changed since the onset of his condition, because he would overdraft his accounts and lose money. (R. at 235.)

Plaintiff's hobbies included reading, watching television and attending sporting events, but he attended events less frequently since the onset of his condition. (R. at 235.) Plaintiff reported that he spent time with others approximately two or three times per month. (R. at 235.) Plaintiff noted that he occasionally attended church services or sporting events. (R. at 235.) He indicated that he needed reminders to go places and needed someone to accompany him when he went out. (R. at 236.) Plaintiff noted that he socialized less, because he avoided noise and crowds. (R. at 236.)

Plaintiff indicated that he did not have problems getting along with others. (R. at 236.) He got along well with authority figures and had never been fired from a job because of problems getting along with others. (R. at 237.) Plaintiff did not handle stress well. (R. at 237.) He did not like changes in his routine, but could handle it. (R. at 237.)

Plaintiff reported that he finished what he started. (R. at 236.) He did not follow written or spoken instructions well, because he would forget. (R. at 236.) His condition affected his ability to lift, squat, bend, stand, reach, walk, kneel, climb stairs, complete tasks, memorize,

concentrate, understand and follow instructions. (R. at 236.)  Plaintiff could lift twenty-five to

fifty pounds. (R. at 236.)  He tired easily after walking, squatting or bending, and he had trouble

understanding instructions. (R. at 236.)  Plaintiff could pay attention for approximately thirty

minutes. (R. at 236.)

E.  Plaintiff's Testimony

On June 19, 2013, Plaintiff (represented by counsel) testified at a hearing before the ALJ.

(R. at 45-57.)  Plaintiff was sixty years old and completed high school. (R. at 48.)  He previously

worked in hotel maintenance. (R. at 48.)  Plaintiff testified that he received unemployment

compensation and applied for jobs up to a year earlier. (R. at 48-49.)

Plaintiff stated that he relied on medications to control his blood pressure, help him sleep,

relieve headaches and for his depression. (R. at 49-50.)  Plaintiff indicated that he slept

approximately five to six hours per night and would get headaches approximately two to three

times per week. (R. at 49.)  He testified that he experienced no side effects from his medications.

(R. at 50.)  Plaintiff also stated that he experienced anxiety attacks approximately once per week.

(R. at 51.)  The anxiety attacks caused sweating, weakness and an increased heart rate. (R. at

51.)  Plaintiff noted that his anxiety increased when he felt scared, nervous or was around a lot of

people. (R. at 51.)

Plaintiff testified that he lived with his mother. (R. at 52.)  Plaintiff could care for his

personal needs without help. (R. at 52.)  Plaintiff explained that during a typical day he went to

the bathroom, prepared meals, cleaned up or washed dishes. (R. at 52.)  Plaintiff shopped in the

grocery store about two times per month and went to the laundromat each month. (R. at 53.)

Plaintiff's sister visited every day to check on Plaintiff and their mother. (R. at 53.)  Plaintiff

visited with his daughter approximately twice per month. (R. at 53.)

Plaintiff testified that he had been previously hospitalized for three days for his depression. (R. at 54.) He stated that he continued to see his doctors and that overall his medications worked well to keep him calm. (R. at 54.) Plaintiff noted that although he took his medications as prescribed, he typically experienced two to three "bad" days per week where he had no energy and "just [didn't] feel like doing anything." (R. at 55.)

Plaintiff testified that he dealt with his alcoholism and participated in a support group. (R. at 55-56.) Plaintiff noted that although he continued to battle with alcoholism, he did not see a therapist or a counselor since the clinic he used to attend shut down. (R. at 56.) He then found his current doctor, but only met with her a few times. (R. at 56.) Plaintiff testified that his employer fired him from his last job in maintenance after he had sat down on the job during a "bad" day and failed to complete his tasks. (R. at 56.)

F.  Vocational Expert Testimony

An impartial VE testified before the ALJ during the June 19, 2013 hearing. (R. at 57-60.) The ALJ asked the VE to classify Plaintiff's past work in terms of exertion and skill level. (R. at 57.) The VE testified that Plaintiff previously worked as a framer — classified as semi-skilled work at the medium exertional level, a machine operator — classified as semi-skilled work at the heavy exertional level, and a hotel maintenance worker — classified as semi-skilled work at the medium exertional level. (R. at 57-58.)

The ALJ then asked the VE whether an individual of Plaintiff's age, education and work experience with certain limitations could perform Plaintiff's past relevant work or jobs existing in the national and local economies. (R. at 58-59.) Specifically, the ALJ asked the VE to assume that the individual had no exertional limitations but was limited to handling simple, repetitive tasks, sustaining concentration for such tasks for two-hour segments or within

10

customary work tolerances with breaks. (R. at 58.) The individual would interact as needed for task completion with supervisors, co-workers, but social interaction demands should generally be minimal with no more than occasional public contact. (R. at 58.) The individual could respond appropriately to change in a routine work setting. (R. at 58.) The VE testified that such a person could not perform Plaintiff's past work. (R. at 58.)

However, the VE stated that such an individual could perform other work at the medium exertional level in the national economy, including as a janitor, with 2,000,000 jobs in the national economy and 30,000 locally, a stock clerk, with 400,000 jobs in the national economy and 4,000 locally, and as a packer, with 700,000 jobs in the national economy and 6,000 locally. (R. at 58-59.) The ALJ then asked the VE whether the same person, who experienced symptoms from the combination of their impairments, including depression, fatigue and anxiety that would interfere with their ability to sustain concentration, persistence and pace two work days per month, could still perform other work at the medium exertional level in the national and local economies. (R. at 59.) The VE testified that such a person would be precluded from work. (R. at 59.)

## II.     PROCEDURAL HISTORY

On August 12, 2011, Plaintiff filed for DIB, alleging an onset date of October 31, 2010. (R. at 29, 174-90.) Plaintiff sought disability due to depression, anxiety, hypertension, sleep apnea, migraine headaches and hyperthyroidism. (R. at 209.) Plaintiff's claims were initially denied on October 13, 2011, and upon reconsideration on January 25, 2012. (R. at 81-82, 103-10, 115-20.) On February 28, 2012, Plaintiff filed a written request for a hearing. (R. at 121-23.) On June 19, 2013, Plaintiff (represented by counsel) testified before the ALJ during a hearing. (R. at 45-57.) On June 28, 2013, the ALJ issued a written decision denying Plaintiff's

claims. (R. at 29-38.) On April 15, 2014, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (R. at 1-4.)

### III. QUESTIONS PRESENTED

1. Did the ALJ err in evaluating Plaintiff's medical opinion evidence?

2. Did the ALJ err in formulating Plaintiff's RFC?

3. Did the ALJ err by failing to obtain an updated consultative examination?

### IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether substantial evidence in the record supports the Commissioner's decision and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla but less than a preponderance, and is the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Id.*; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

To determine whether substantial evidence exists, the Court must examine the record as a whole, but may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson*, 434 F.3d at 653). In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in the record supports the findings, are conclusive and must

be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*, 667 F.3d at 477. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2000). An ALJ conducts the analysis for the Commissioner, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied, and whether substantial evidence in the record supports the resulting decision of the Commissioner. *Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA"). 20 C.F.R. §§ 404.1520(b), 416.920(b). SGA is work that is both substantial and gainful as defined by the Agency in the Code of Federal Regulations. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.*

13

If the claimant establishes that he did not engage in SGA, the second step of the analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ must determine whether the claimant can return to his past relevant work[3] based on an assessment of the claimant's RFC[4] and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from performing his past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472.

---

[3]      Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 404.1565(a), 416.965(a).

[4]      RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

However, if the claimant cannot perform his past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 416.920(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The Commissioner can carry her burden in the final step with the testimony of a VE. When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

## V.    ANALYSIS

A. The ALJ's Decision.

On June 28, 2013, the ALJ issued a written decision, finding that Plaintiff was not disabled under the Act. (R. at 29-38.) The ALJ followed the five-step sequential evaluation as established by the Act in analyzing whether Plaintiff was disabled. (R. at 31-38.)

At step one, the ALJ found that Plaintiff had not engaged in SGA since his alleged onset date. (R. at 31.) At step two, the ALJ determined that Plaintiff suffered from the severe impairments of mood disorder and history of alcohol abuse. (R. at 31.) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or

medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1. (R. at 31-33.) The ALJ further determined that Plaintiff had the RFC to: perform a

full range of work at all exertional levels, but with the nonexertional limitations that he handle

simple repetitive tasks, sustain concentration towards such tasks for two-hour segments (or

within customary work tolerances, with breaks); interact with co-workers and supervisors as

needed for task completion, but social interaction demands should generally be minimal with no

more than occasional public contact; and, respond appropriately to change in a routine work

setting. (R. at 33-36.)

At step four, the ALJ concluded that Plaintiff could not perform his past relevant work.

(R. at 37.) Finally, at step five, based upon Plaintiff's age, education, work experience and RFC,

the ALJ determined that Plaintiff could perform jobs existing in the national economy. (R. at 37-

38.) Accordingly, the ALJ found that Plaintiff was not disabled under the Act. (R. at 38.)

Plaintiff challenges the ALJ's decision on several grounds. First, Plaintiff argues that the

ALJ erred in evaluating Plaintiff's medical opinion evidence. (Pl.'s Br. in Supp. of Pl.'s Mot. for

Summ. J. ("Pl.'s Mem.") (ECF No. 14) at 15-21.) Second, Plaintiff claims that the ALJ erred in

assessing Plaintiff's RFC. (Pl.'s Mem. at 22-23.) Finally, Plaintiff argues that the ALJ erred in

failing to obtain an updated consultative examination. (Pl.'s Mem. at 23-24.) Defendant

responds that the ALJ correctly evaluated the opinion evidence. (Def.'s Mot. for Summ. J. & Br.

in Supp. Thereof ("Def.'s Mem.") (ECF No. 15) at 12-15.) Next, Defendant asserts that the ALJ

did not err in assessing Plaintiff's RFC. (Def.'s Mem. at 15-16.) Finally, Defendant argues that

the ALJ appropriately determined that a consultative examination was not warranted. (Def.'s

Mem. at 17-19.)

B.  The ALJ did not err in evaluating Plaintiff's medical opinion evidence.

Plaintiff argues that the ALJ erred in disregarding Dr. Goli's and Dr. Hejazi's GAF

scores of 30 and 40, and that the ALJ should have assigned great weight to Dr. Goli's and Dr.

Hejazi's opinions.  (Pl.'s Mem. at 16-21.)  Plaintiff further asserts that the ALJ erred in adopting

the opinions of Dr. Saxby and Dr. Oritt, the non-examining state agency psychologists.  (Pl.'s

Mem. at 16-21.)  Defendant responds that substantial evidence supports the ALJ's

determinations.  (Def.'s Mem. at 12-16.)

During the sequential analysis, when the ALJ determines whether the claimant has a

medically determinable severe impairment, or combination of impairments that would

significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ

must analyze the claimant's medical records that are provided and any medical evidence

resulting from consultative examinations or medical expert evaluations that have been ordered.

20 C.F.R. §§ 404.1512(a)-(e), 416.912(a)-(e); 20 C.F.R. §§ 404.1527, 416.927.  When the record

contains a number of different medical opinions, including those from Plaintiff's treating

sources, consultative examiners or other sources that are consistent with each other, then the ALJ

makes a determination based on that evidence.  20 C.F.R. §§ 404.1520b(a), 416.920b(a).  If,

however, the medical opinions are internally inconsistent with each other or other evidence, the

ALJ must evaluate the opinions and assign them respective weight to properly analyze the

evidence involved.  20 C.F.R. §§ 404.1527(c)(2)-(6), (e), 416.927(c)(2)-(6), (e).

Under the applicable regulations and case law, a treating source's opinion must be given

controlling weight if it is well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with other substantial evidence in the record.

*Craig*, 76 F.3d at 590; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p.  Further, the

regulations do not require that the ALJ accept opinions from a treating source in every situation, *e.g.*, when the source opines on the issue of whether the claimant is disabled for the purposes of employment (an issue reserved for the Commissioner), or when the source's opinion is inconsistent with other evidence or when it is not otherwise well-supported.  20 C.F.R. §§ 404.1527(c)(3)-(4), (d), 416.927(c)(3)-(4), (d).

The ALJ must consider the following when evaluating a treating source's opinions:  (1) the length of the treating relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and (6) any other relevant factors.  20 C.F.R. §§ 404.1527(c), 416.927(c).  However, those same regulations specifically vest the ALJ — not the treating source — with the authority to determine whether a claimant is disabled as that term is defined under the Act.  20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).

> 1.  The ALJ did not err in evaluating Dr. Goli and Dr. Hejazi's GAF score determinations.

Plaintiff argues that the ALJ erred in "disregard[ing]" Dr. Goli and Dr. Hejazi's GAF score determinations.  (Pl.'s Mem. at 16-21.)  Defendant responds that substantial evidence supports the ALJ's determinations.  (Def.'s Mem. at 12-16.)

In January 2011, Dr. Goli and Dr. Hejazi treated Plaintiff for severe depression with suicidal ideations after he was admitted to the Community Memorial Pavilion.  (R. at 285-88.) On January 2, 2011, Plaintiff was hospitalized after he stabbed himself in the stomach.  (R. at 285.)  On January 3, 2011, Dr. Goli completed Plaintiff's psychiatric evaluation.  (R. at 285-86.) Dr. Goli opined that Plaintiff suffered from psychosocial stressors, including the loss of his job,

the anniversary of his wife's death and loneliness. (R. at 285.)  Dr. Goli assigned Plaintiff a

GAF score of 30 during his hospitalization. (R. at 286.)

On January 5, 2011, Dr. Hejazi, Plaintiff's hospital discharge physician, completed a

discharge summary evaluation. (R. at 287-88.)  Dr. Hejazi concluded that Plaintiff demonstrated

no manic, hypomanic, psychotic or suicidal symptoms. (R. at 288.)  Dr. Hejazi opined that

Plaintiff's condition at discharge showed partial improvement and equivocal prognosis. (R. at

288.)  Dr. Hejazi assigned Plaintiff a GAF score of 40 at discharge.

On June 6, 2011, Dr. Seo examined Plaintiff. (R. at 350.)  Dr. Seo observed that Plaintiff

dressed properly and demonstrated good personal hygiene and care. (R. at 350.)  Plaintiff

appeared calm and relaxed, exhibited good eye-contact and maintained pleasant interactions. (R.

at 350.)  Dr. Seo noted that Plaintiff demonstrated bright affect, normal speech and clear thought.

(R. at 350.)  Dr. Seo assigned Plaintiff a GAF score of 65. (R. at 351.)

The ALJ was forced to reconcile and assign weight to the above divergent medical

opinions of Dr. Goli, Dr. Hejazi and Dr. Seo.  In doing so, the ALJ did not completely disregard

Dr. Goli and Dr. Hejazi's GAF scores.  Indeed, the ALJ stated in his opinion:

> Consideration has been given to the medical provider's subjective
> GAF scores.  However, a specific GAF score is only a "snap shot
> of a person's functioning at a particular point in time" and "not a
> longitudinal indicator of . . . functioning. *Brown v. Astrue*, 2008
> U.S. Dist. LEXIS 105102 *15 n.6 (W.D. Va. Dec. 31, 2008).  The
> GAF score of 65 in June 2011 is generally consistent with the
> findings in this decision of only mild limitations.  The GAF score
> of 30 given in January 2011 was opined at a time of
> decompensation; and the claimant subsequently received treatment
> and was discharged in stable condition.  These scores have been
> given appropriate weight.

(R. at 36) (internal citations omitted.)  Consequently, the ALJ considered Dr. Goli and Dr.

Hejazi's scores, but chose to discount them, because they did not correspond to the consistent

findings of mild limitations in Plaintiff's medical record. Substantial evidence supports the ALJ's determination.

Plaintiff's medical records support the ALJ's determination. On May 28, 2010, Dr. Huot observed that Plaintiff appeared pleasant, alert and fully oriented. (R. at 312-13.) On October 28, 2010, Dr. Huot again noted that Plaintiff remained pleasant, alert and fully oriented. (R. at 310-11.) On January 2, 2011, when Plaintiff was hospitalized after stabbing himself, he denied any psychosis or intent to hurt himself. (R. at 285-86.) On January 3, 2011, Dr. Goli opined that Plaintiff appeared alert, oriented and cooperative, as well as cognitively intact. (R. at 286.) Plaintiff subsequently completed detox treatment and requested to be discharged from the hospital. (R. at 287-88.) On January 5, 2011, Dr. Hejazi concluded that Plaintiff exhibited no manic, hypomanic, psychotic or suicidal symptoms, and opined that Plaintiff had partially improved and showed equivocal prognosis. (R. at 288.)

On June 6, 2011, Plaintiff presented to Dr. Seo with no complaints. (R. at 349.) Plaintiff discussed that he felt "all right" after his January 2011 hospitalization and reported that he took his medication regularly. (R. at 349.) Dr. Seo observed that Plaintiff appeared calm, relaxed, exhibited good eye-contact, maintained pleasant interactions and demonstrated good personal hygiene and care. (R. at 350.) Dr. Seo opined that Plaintiff exhibited bright affect, normal speech, clear thought and had no suicidal or homicidal ideation. (R. at 350.) Further, Plaintiff remained alert, well-oriented and had good attention and memory. (R. at 350.)

On August 5, 2011, Dr. Huot observed that Plaintiff appeared well-oriented and fully alert. (R. at 303.) Plaintiff complained that he experienced headaches, but indicated that Tylenol usually relieved the pain. (R. at 302.) On August 15, 2011, Plaintiff discussed with Dr. Seo that he slept well, continued to search for employment and remained sober since his January 2011

hospitalization. (R. at 351.) Dr. Seo observed that Plaintiff appeared calm, cooperative and denied any suicidal ideation. (R. at 356.) On December 15, 2011, Plaintiff stated to Dr. Seo that he continued to search for employment and worked on minimizing his alcohol consumption. (R. at 356.) Dr. Seo observed that Plaintiff appeared calm, cooperative and denied suicidal ideation. (R. at 356.)

Similarly, Plaintiff's own statements — both to treatment providers and made during his hearing before the ALJ — support the ALJ's determination. Plaintiff indicated that he had no problem tending to his personal care, prepared his own meals, cleaned, shopped in grocery stores and went outside several times per day. (R. at 52-53, 232-34.) Plaintiff stated that he could pay bills, count change, handle a savings account and use a checkbook or money order. (R. at 234.) He reported that he spent time with others approximately two or three times per month and occasionally attended church services or sporting events. (R. at 235.) He did not have problems getting along with others and finished what he started. (R. at 236-37.) Plaintiff testified that he experienced no side effects from his medications. (R. at 49-51.) Additionally, Plaintiff testified that his medications worked well to keep him calm. (R. at 54.) He testified that he dealt with his alcoholism and participated in a support group. (R. at 56.) Therefore, the ALJ did not err in his evaluation of Dr. Goli and Dr. Hejazi's GAF scores.[5]

       2.   The ALJ did not err in the weight afforded to the state agency psychologists' opinions.

Plaintiff argues that the ALJ's decision to accept and give significant weight to the opinions of Dr. Saxby and Dr. Oritt was unsupported by substantial evidence. (Pl.'s Mem. at 16-

---

[5]    It bears reiterating that the latest version of the DSM has dropped the use of GAF scores, finding that their use has been criticized due to a "conceptual lack of clarity," and "questionable psychometrics in routine practice." DSM (5th ed.), *supra* note 2, at 16. Thus, the GAF scores have diminished significance as to an evaluation of Plaintiff's mental health.

21.) Defendant counters that the ALJ's decision to accept and weigh these opinions was supported by substantial evidence. (Def.'s Mem. at 12-16.)

State agency medical consultants are highly qualified physicians who are experts in Social Security disability evaluation. 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i). Therefore, when considering the opinion of a state agency medical consultant, the ALJ must evaluate those findings just as he would for any other medical opinion. 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii). Except when a treating source's opinion is afforded controlling weight, the ALJ must "explain in the decision the weight given to the opinions of a [s]tate agency medical . . . consultant . . . as the [ALJ] must do for any opinions from treating sources, nontreating sources, and other nonexamining sources." 20 C.F.R. §§ 404.1527(e)(ii), 416.927(e)(ii).

In this case, the ALJ did not afford a treating source controlling weight. The ALJ acknowledged the expertise of the state agency physicians in evaluating Social Security disability claims such as Plaintiff's, and noted that Dr. Saxby and Dr. Oritt both determined that Plaintiff was capable of performing simple, unskilled work based on the evidence in the record. (R. at 36, 67-68, 87-88.) The ALJ stated that he considered their assessments and gave them significant weight in formulating his opinion, and noted that these expert opinions were balanced, objective and consistent with the evidence of record. (R. at 36.) The ALJ further noted that no opinions of record from treating or examining sources suggested that Plaintiff was disabled or had limitations beyond those found by the state agency psychologists. (R. at 36.)

Plaintiff's treatment records support the ALJ's determination. Plaintiff frequently appeared pleasant, alert, fully oriented, calm and cooperative. (R. at 286, 303, 306, 309, 311-13, 316, 318, 320, 350, 356.) Significantly, even immediately after Plaintiff's hospitalization, Dr.

22

Goli observed that Plaintiff remained alert, oriented and cooperative. (R. at 286.) On January 5, 2011, Dr. Hejazi noted that Plaintiff's mental status examination at the time of his discharge from the hospital revealed that he remained alert, oriented to time, person, place and situation, and that he maintained fair eye contact. (R. at 287.) On June 6, 2011, Dr. Seo observed that Plaintiff demonstrated good personal hygiene and care, and exhibited good eye-contact, bright affect, normal speech and clear thought. (R. at 350.) On September 7, 2012, Dr. Reilly observed that Plaintiff's headaches had largely disappeared. (R. at 365.)

Plaintiff's own statements and statements — both to treatment providers and made during his hearing before the ALJ — provide further support for the ALJ's decision. Plaintiff repeatedly denied to his doctors any psychosis, intent to hurt himself or suicidal ideation. (R. at 285, 288, 349-50, 356, 363.) On June 6, 2011, Plaintiff presented to Dr. Seo with no complaints and stated that he felt "all right" after his January 2011 hospitalization and reported that he took his medications regularly. (R. at 349.) In August and December 2011, Plaintiff reported that he continued to search for employment and worked on minimizing his alcohol consumption. (R. at 351, 356.) Plaintiff repeatedly stated that he had no problem tending to his personal care, prepared his own meals, cleaned, shopped in grocery stores and went outside several times per day. (R. at 52-53, 232-34.) Plaintiff reported that he could pay bills, count change, handle a savings account and use a checkbook or money order. (R. at 234.) Plaintiff attended church services or sporting events. (R. at 235-36.) Further, Plaintiff testified that his medications worked well to keep him calm. (R. at 54.) Therefore, substantial evidence supports the ALJ's decision regarding the opinions of the state agency physicians.

23

C.  The ALJ did not err in assessing Plaintiff's RFC.[6]

Plaintiff asserts that the ALJ's assessment of Plaintiff's RFC is unsupported by substantial evidence, because it fails to include all of Plaintiff's limitations resulting from his depression.  (Pl.'s Mem. at 22-23.)  Defendant counters that the ALJ's RFC assessment is supported by substantial evidence and fully accounts for all of Plaintiff's limitations.  (Def.'s Mem. at 15-16.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC.  20 C.F.R §§ 416.902(e)-(f), 416.945(a)(1).  In analyzing a claimant's abilities, the ALJ must first assess the nature and extent of the claimant's physical limitations, and then determine the claimant's RFC for work activity on a regular and continuing basis.  20 C.F.R. § 416.945(b). Generally, the claimant is responsible for providing the evidence that the ALJ utilizes in making his RFC determination; however, before determining that a claimant is not disabled, the ALJ must develop the claimant's complete medical history, including scheduling consultative examinations if necessary.  20 C.F.R. § 416.945(a)(3).  The RFC must incorporate impairments supported by the objective medical evidence in the record, as well as those impairments that are based on the claimant's credible complaints.  *Carter v. Astrue*, 2011 WL 2688975, at *3 (E.D. Va. June 23, 2011); *accord* 20 C.F.R. § 416.945(e).

The ALJ stated that after considering all of Plaintiff's physical and mental impairments,

---

[6]      In light of *Mascio v. Colvin*, 780 F.3d 632, 639 (4th Cir. 2015), this Court entered an order on April 14, 2015 (ECF No. 16), directing Defendant to brief whether *Mascio* impacts the issues in this case.  Defendant filed a Memorandum, arguing that the ALJ adequately addressed Plaintiff's functional limitations when the ALJ determined Plaintiff's RFC and that the ALJ thoroughly discussed all of the relevant evidence.  (Def.'s Supplemental Br. In Light of *Mascio v. Colvin* ("Def.'s Supplemental Br.") (ECF No. 17) at 2-5.)  Plaintiff did not file a response. The Court concludes that *Mascio* has no impact on this case.

he found that Plaintiff retained the RFC to perform a full range of work at all exertional levels, but with the additional nonexertional limitations. (R. at 33.) Specifically, the ALJ concluded that Plaintiff could handle simple repetitive tasks, sustain concentration towards such tasks for two-hour segments (or within customary work tolerances with breaks), interact with co-workers and supervisors as needed for task completion (but social interaction demands should generally be minimal, with no more than occasional public contact) and respond appropriately to change in a routine work setting. (R. at 33.)

Plaintiff's medical records support the ALJ's RFC assessment. Between May 2010 through December 2011, treating physicians consistently observed that Plaintiff appeared pleasant, alert, fully oriented, calm and cooperative. (R. at 286, 303, 306, 309, 311-13, 316, 318, 320, 350, 356.) Notably, immediately after Plaintiff's hospitalization, Dr. Goli observed that Plaintiff remained alert, oriented and cooperative. (R. at 286.) Plaintiff consistently denied any psychosis, intent to hurt himself or suicidal ideation. (R. at 285, 288, 349-50, 356, 363.) On June 6, 2011, Plaintiff visited Dr. Seo and reported no complaints. (R. at 359.) Plaintiff admitted that he felt "all right" after his January 2011 hospitalization and that he continued to take his medications regularly. (R. at 349.) Dr. Seo opined that Plaintiff exhibited bright affect, normal speech and clear thought. (R. at 350.) In August and December 2011, Plaintiff stated that he continued to search for employment opportunities. (R. at 351, 356.)

The state agency psychologists' opinions further support the ALJ's determination. On October 12, 2011, Dr. Saxby reviewed Plaintiff's medical records and assessed Plaintiff's mental RFC. (R. at 64-68.) Dr. Saxby concluded that Plaintiff retained the RFC to perform simple, unskilled work. (R. at 67-68.) On January 25, 2012, Dr. Oritt also assessed Plaintiff's mental impairments and mental RFC based on his evaluation of Plaintiff's mental health treatment

records. (R. at 87-91.) Dr. Oritt ultimately agreed with Dr. Saxby's assessment and concluded that Plaintiff retained the RFC to perform simple, unskilled work. (R. at 90.)

Plaintiff's own statements lend further support to the ALJ's RFC determination. Plaintiff testified that he tended to his personal care, prepared meals, cleaned, shopped in grocery stores and went outside several times each day. (R. at 52-53, 232-34.) Plaintiff could pay bills, count change, handle a savings account and use a checkbook or money order. (R. at 234.) Plaintiff reported that he did not have any problems getting along with others and finished what he started. (R. at 236-37.) Plaintiff socialized and attended church services and sporting events. (R. at 235-36.) Plaintiff testified that his medications worked well to keep him calm. (R. at 54.) Therefore, substantial evidence supports the ALJ's RFC determination.

D. The ALJ did not fail to obtain an updated consultative examination.

Plaintiff argues, alternatively, that the ALJ failed to order a consultative examination as required under 20 C.F.R. § 404.1519 to resolve Plaintiff's inconsistent and incomplete medical records, because physicians assigned him varying GAF scores. (Pl.'s Mem. at 23-24.) Defendant counters that substantial evidence supports the ALJ's decision and that the ALJ appropriately determined that a consultative examination was not warranted. (Def.'s Mem. at 17-19.)

Although the ALJ must consider the record as a whole, there is no duty to further develop the record. The ALJ must inquire into issues necessary for adequate development of the record, but "the ALJ is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record." *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994). While the ALJ must make a reasonable inquiry into a claim of disability, the ALJ has no duty to "go to inordinate lengths to develop a claimant's case." *Thompson v. Califano*, 556 F.2d 616, 618 (1st

26

Cir. 1977). The Fourth Circuit has explained that "the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when the evidence is inadequate" for the purpose of determining whether the claimant is disabled. *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). Thus, the need to develop the record is triggered when there is insufficient or inconsistent evidence. 20 C.F.R. § 404.1520b. Discretion lies with the ALJ to determine whether to further develop the record or seek additional information from medical sources. 20 C.F.R. § 404.1520b.

Under the applicable regulations, a consultative examination may be procured for the claimant when the record must be further developed to seek additional information or resolve inconsistencies. 20 C.F.R. §§ 404.1519, 416.919a(a). Determinations to purchase a consultative examination are made on an individual basis, in accordance with the provisions provided in 20 C.F.R. §§ 404.1519a-f, 416.919a-f. The regulations provide that consultative examinations may be purchased where the claimant's medical records are insufficient. 20 C.F.R §§ 404.1519a, 416.919a. Further, a consultative examination may be sought "to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim." 20 C.F.R. §§ 404.1519a(b), 416.919a(b).

In this case, Plaintiff's medical records were consistent and sufficient, thus the ALJ did not need to order a consultative examination. Between May 2010 through September 2012, Plaintiff repeatedly appeared pleasant, alert, oriented and cooperative. (R. at 286, 303, 306, 309, 311-13, 316, 318, 320, 350, 356.) Although Plaintiff was admitted into the hospital in January 2011, Dr. Goli and Dr. Hejazi both opined that he remained calm, alert, and oriented to time, place, person, place and situation. (R. at 286-87.) Plaintiff consistently denied any psychosis,

intent to hurt himself or suicidal ideation, but admitted that he felt depressed and that he continued to consume alcohol. (R. at 285, 288, 349-50, 356, 363.) Further, on June 6, 2011, Plaintiff underwent a full mental examination and evaluation with Dr. Seo. (R. at 350.) Dr. Seo observed that Plaintiff demonstrated good hygiene and care, maintained good eye-contact and exhibited bright affect, normal speech and clear thought. (R. at 349-51.) Plaintiff appeared calm, relaxed, exhibited good eye-contact and maintained pleasant interactions. (R. at 350.) Plaintiff remained alert and well-oriented with good attention and memory. (R. at 350.) Dr. Seo assigned Plaintiff a GAF score of 65, indicating that Plaintiff only suffered mild symptoms. (R. at 351.) On August 15, 2011, Plaintiff returned to Dr. Seo and complained of increased sadness, but also stated that he slept well, continued to search for employment and remained sober since January 2011. (R. at 351.)

Plaintiff's own statements made during the June 19, 2013 hearing also support the ALJ's decision. Plaintiff testified that he tended to his personal care, prepared his own meals, cleaned, shopped in grocery stores and went outside every day. (R. at 52-53.) Plaintiff further testified that his medications worked well to keep him calm. (R. at 54.) He also stated that he dealt with his alcoholism and participated in a support group. (R. at 55-56.) Therefore, substantial evidence in the record supports the ALJ's decision that a consultative examination was not warranted.

## VI.    CONCLUSION

For the reasons stated above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 12) and Motion for Remand (ECF No. 13) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 15) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk file this Report and Recommendation electronically and forward a copy to the Honorable Robert E. Payne with notification to all counsel of record.

### NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: _September 1, 2015_